UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

| | |
|---|---|
| KEIR PITTS <br> 2900 Mainline Blvd, Apt 325 <br> Alexandria, VA 22301 <br>     Plaintiff <br> <br> v. <br> <br> ANTONY BLINKEN, <br> Secretary, U.S. Department of State <br> Washington, DC <br> <br>     Defendant. | * <br> * <br> * <br> * <br> *    JURY TRIAL DEMANDED <br> * <br> * <br> * <br> * <br> * <br> * <br> * |

## COMPLAINT

Plaintiff, Keir Pitts, brings this case because Defendant unlawfully discriminated against him based on his race, color, and national origin, by forcing him to curtail his Post Assignment in Kingston, Jamaica and thereby terminating his appointment with the Foreign Service, in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e-16(c).

## JURISDICTION

1. This Court has federal question jurisdiction over the subject matter of this civil action pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e-16(c).

## VENUE

2. Pursuant to 28 U.S.C. § 1391(b) and 42 U.S.C. § 2000e-5(f)(3), venue is proper in this judicial district as the relevant employment records are maintained in Washington, D.C. by the Defendant.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

3. All of the necessary administrative prerequisites for filing the above referenced claims have been met, as the agency issued a Final Agency Decision on May 27, 2021.

## PARTIES

4. Plaintiff Keir Pitts is an African-American, black man who was born in the United States, lived and worked in Kingston, Jamaica at all times relevant to this complaint.

5. Defendant, Antony Blinken, Secretary, U.S. Department of State, is named in his official capacity as Secretary of the Agency that employed Plaintiff within the U.S. Government. Defendant maintains its personnel records in the District of Columbia and is headquartered in the District of Columbia.

## FACTS

6. Plaintiff was assigned to the U.S. Department of State's Mission in Kingston, Jamaica in June 2018. His tour was scheduled to end March 2021.

7. Plaintiff reported to Jeff Osweiler, the Nonimmigrant Visa chief. His second level supervisor was Scott Feeken, Deputy Consul General. Mr. Feeken reported to John McIntyre, Deputy Chief of Mission. Ambassador Donald Tapia supervised the entire mission in Kingston Jamaica.

8. Mr. Pitts served as a full-service Consular Adjudicator with 20 Foreign Service Officers and Adjudicators. Consular Adjudicators may rotate through several units of the Consular Section during a tour, including American Citizen Services (ACS), nonimmigrant Visas (NIV), and Immigrant Visas (IV). His

responsibilities included:

   a. Adjudicate nonimmigrant and immigrant visa applications in accordance with all relevant laws and regulations, in support of the U.S. Government goals of ensuring national security, deterring illegal immigration, and promoting legitimate travel.

   b. Support the operations of the unit of assignment through high productivity in managing workload, and by ensuring courteous and efficient service to applicants.

   c. Develop a thorough understanding of, and familiarity with the Immigration and Nationality Act (INA) AND FOREIGN AFFAIRS MANUAL (FAM), VOLUMES 7 AND 9, to ensure consistent standards in consular operations.

   d. Build and advance consular relationships with local government official, other foreign consulate official and the overseas American community.

   e. Keep supervisors fully informed of any issue or case that involves possible waste, fraud, or abuse or that could impact security, staff morale, or the public image of the U.S. Government.

   f. Conduct outreach activities to further consular goals and policies.

   g. Practice security awareness; report and/or address possible safety hazards and/or unsafe practices; follow security directives, regulations, and policies; safeguard classified information, material, and equipment.

   h. Uphold the Department of State's six core values (accountability, character, community, diversity, loyalty, service) and the Department's Leadership and Management Principles; observe and implement EEO principles.

9. In March 2020, Mr. McIntyre ordered Plaintiff and two other African-American, black employees to request a voluntary curtailment of their assignment to Jamaica.

10. Plaintiff's supervisor, Mr. Osweiler had pre-approved his travel plans and sick leave from March 11, 2020, scheduled to return on March 16.

11. A polyp was found on Plaintiff's colon and he was due for follow-up to determine if the polyp was cancerous.

12. On March 10, a staff member returning from the U.K. suspected she had COVID-19. The acting Consul General, Scott Feeken held a section wide meeting where he advised the staff to go home and await further word.

13. Plaintiff was scheduled to fly to the United States for his medical appointment the next day. Plaintiff spoke with Mr. Feeken, the acting Consul General that day and explained that he had pre-approved travel for medical reasons the next day.

14. Plaintiff sought Mr. Feeken's guidance on the phone that day, as he was not sure what to do under the circumstances. Mr. Feeken asked if it was official travel, and Plaintiff informed him that it was for personal medical reasons.

15. As a colon cancer survivor, Plaintiff knew that his chance of surviving colon cancer was much better if the cancer was detected earlier. The acting Consul General seemed to empathize with Plaintiff and said to him, "I can not tell you not to travel."

16. Indeed, no one told Plaintiff that he should not travel or said that he was under quarantine. Plaintiff had several phone calls with the acting General Consul wherein he reiterated that he was not telling him not to travel.

17. After three conversations in which the acting General Consul left the decision to Plaintiff's discretion, he did travel to the United States for his medical appointment.

18. That same day, Yonas Hunegaw, a light-skinned coworker of Ethiopian descent, also traveled to the United States. Mr. Hunegaw traveled to Washington, D.C. for a job assessment.

19. On Friday March 13, the embassy medical office began clearing employees who

did not sit close to the individual who was infected or otherwise had any interaction with her on March 9 or 10. All American personnel that sat around Plaintiff were taken off of quarantine.

20. On March 16, Plaintiff received an e-mail from the Consul General Mark Seibel with a letter notifying him that he must voluntarily curtail or be involuntarily curtailed allegedly because he traveled to the US while under a self-quarantine.

21. However, at no point throughout any of their conversations, did the acting Consul General say that Plaintiff was under quarantine, or that he could not travel. Quite the opposite, he reiterated that he was <u>not</u> telling Plaintiff he could not travel. Furthermore, as of March 11, the day Plaintiff and Yonas Hunegaw traveled to the U.S., the staff had only been told to await further word regarding the situation.

22. In contrast, when the individual's test results came back positive on March 12, the entire Consular section was notified via conference call that they must quarantine in place. At that time, Plaintiff quarantined in place in the U.S.

23. After receiving the letter, Plaintiff called the DCM the next day. He explained that he was never placed under any type of quarantine and that his supervisors knew about Plaintiff's travel plans and had had multiple conversations about it, and never once was told not to travel. The DCM ignored this information and repeated that Plaintiff must curtail or would be curtailed involuntarily.

24. Plaintiff subsequently learned that he could request authorized departure, which he began on March 20, 2020, until he resigned from the foreign service on August 29, 2020.

25. Plaintiff did not receive any counseling or discipline from management during his

time in Kingston.

26. Two other African-American, black employees of U.S. origin were asked to leave post during the same time frame by the same Ambassador and Deputy Chief of Mission.

## COUNT 1

27. Plaintiff repeats and realleges the allegations set forth in paragraphs 1-26.

28. By and through its conduct, Defendant subjected Plaintiff to unlawful race discrimination in violation of Title VII of the Civil Rights Act of 1964.

29. Plaintiff has sustained damages as a result of the unlawful discrimination including loss of pay, humiliation, career damage, and emotional and physical pain.

## COUNT 2

30. Plaintiff repeats and realleges the allegations set forth in paragraphs 1-29.

31. By and through its conduct, Defendant subjected Plaintiff to unlawful color discrimination in violation of Title VII of the Civil Rights Act of 1964.

32. Plaintiff has sustained damages as a result of the unlawful discrimination including loss of pay, humiliation, career damage, and emotional and physical pain.

## COUNT 3

33. Plaintiff repeats and realleges the allegations set forth in paragraphs 1-32.

34. By and through its conduct, Defendant subjected Plaintiff to unlawful national origin discrimination in violation of Title VII of the Civil Rights Act of 1964.

35. Plaintiff has sustained damages as a result of the unlawful discrimination

including loss of pay, humiliation, career damage and emotional and physical pain.

## JURY DEMAND

Plaintiff demands a trial by jury on each count in this Complaint.

WHEREFORE, Plaintiff demands judgment against Defendant on Count 1 and seeks reinstatement, purging of record, reasonable attorneys' fees, or purging of record, front pay, lost wages and benefits, compensatory damages in the amount of $300,000, or such other amount as is determined by a jury for pain and suffering, mental anguish, emotional distress and in addition, Plaintiff demands reasonable attorneys' fees.

Dated:  July 14, 2021                                          Respectfully submitted,

ALAN LESCHT AND ASSOCIATES, P.C.

*/s/ Ellen K. Renaud*
Ellen K. Renaud (Bar No. 479376)
1825 K Street, NW, Suite 750
Washington, DC 20006
Tel (202) 463-6036
Fax (202) 463-6067
Ellen.Renaud@leschtlaw.com